DONALD A. PECK and JUDITH W. PECK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Peck v. Commissioner
Docket Nos. 7771-79, 12398-80.
United States Tax Court
T.C. Memo 1982-17; 1982 Tax Ct. Memo LEXIS 732; 43 T.C.M. (CCH) 291; T.C.M. (RIA) 82017; January 12, 1982. Harry J. Kaplin, for the petitioners. Rebecca T. Hill, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: In these consolidated cases, respondent determined deficiencies of $ 4,269, $ 11,595, and $ 14,201 in petitioners' Federal income taxes *733 for the years 1974, 1975, and 1976, respectively. Due to concessions, the only issue is to what extent, if at all, petitioners are entitled to deduct certain rents paid to their closelyheld corporation. FINDING OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Donald A. Peck and Judith W. Peck, were residents of Saratoga, Calif., at the time they filed their petitions herein. Petitioner Donald A. Peck is a surgeon. Petitioner Judith W. Peck is a housewife. Petitioners, as joint tenants, owned eight parcels of improved real estate, which included six parcels of residential rental property and two parcels of commercial rental property. Petitioners purchased those properties between 1968 and 1973, and all such properties were subject to purchase-money mortgages. During the taxable years in issue, all those properties produced substantial rental income. On September 11, 1974, petitioners created Peck Leasing Ltd., a corporation organized under the laws of California. Petitioners transferred to Peck Leasing Ltd. (hereinafter Peck Leasing or corporation), by duly recorded grant deeds, the land portions of the eight parcels of improved *734 real estate owned by them. The improvements on the real property were not transferred to the corporation but, instead, were retained by petitioners. In exchange for the land, Peck Leasing issued 5,000 shares of Class A voting stock to petitioner Donald A. Peck and 23,300 shares of Class B nonvoting stock to petitioners Donald A. and Judith W. Peck. [1]
Simultaneous with the transfers of land to Peck Leasing, petitioners agreed to lease back such land from Peck Leasing. Lease agreements were executed between Peck Leasing as landlord, and petitioners, as tenants or lessees, for all eight parcels of land. With minor exceptions, the lease agreements pertaining to all eight parcels of land were substantially the same. [2] The term of the lease was for 30 years with two 10-year renewal options given to petitioners as lessees. After five years from the date of the lease, and during the remaining portion of the lease, petitioners had the option *735 to purchase the land for its fair market value free of encumbrances except those appearing of record at the commencement of the lease. Such fair market value was to be determined, in the event of the parties' disagreement, by an independent appraiser. The landlord, Peck Leasing, had the right to sell the land at any time but during the first five years of the lease, petitioners had the right of first refusal. Peck Leasing's interest was generally subordinate to any loans petitioners might take out to further improve the properties. Upon expiration of the lease, petitioners were required to surrender all improvements situated on the leased premises to the corporation. Under the lease agreements, petitioners were obligated to pay all taxes on the leased premises, including those taxes attributable to both the land and improvements. Petitioners were obligated to hold the corporation harmless for any liability by reason of injury or death of any person or damage to any property when connected in any way with *736 the properties at issue herein. Should petitioners default on any lease provision, the landlord, Peck Leasing, had the right of reentry and the right to terminate the lease. Petitioners continued to service the debt secured by mortgages on all eight parcels. Petitioners paid interest and principal amortization on the notes secured by both the land and improvements, which amounted to $ 52,692 for each taxable year in issue. At the time of the transfer to Peck Leasing, the land and improvements of all eight parcels had an aggregate fair market value of greater than $ 950,000 while the land portion of those eight parcels had an aggregate fair market value of $ 283,000. Peck Leasing carried the land on its books at a fair market value of $ 283,000. The land and improvements were subject to an aggregate nonrecourse liability of $ 506,585. For the first five years of the lease, which includes the taxable years in issue, the land rent for all eight parcels totalled $ 24,870 per year. This rental figure was arrived at by multiplying the fair market value of the land by nine percent, the then applicable rate of interest, with a small adjustment for a decrease in value of one of the *737 subject properties. After the first five years, the rent was tied into the Consumer Price Index, with an increase in the annual rent following a like percentage increase in the index. The primary incentive for creating Peck Leasing was to establish an alternative source of income for petitioners which would also serve as added protection should petitioner, Donald A. Peck, ever be prevented from practicing his profession as a surgeon. Within six months after its incorporation, Peck Leasing had entered the automobile leasing business. For its first taxable year, FYE June 30, 1975, Peck Leasing reported, on its balance sheet, fixed depreciable assets less depreciation of $ 27,532.45 and land worth $ 283,000. By its taxable year ending June 30, 1980, Peck Leasing reported total assets of $ 657,004.71, gross rents of $ 155,406.90, and a net income on its books of $ 50,865.67. Peck Leasing prospered and by the time of trial, leased a fleet of automobiles with a total value in excess of $ 600,000. Rental income from the land was used by Peck Leasing to purchase automobiles for lease. In applying for loans for car purchases by Peck Leasing, petitioner Donald A. Peck submitted a *738 statement of his own income but not one of the corporation's income. Petitioners personally guaranteed all loans to Peck Leasing. The corporation has paid no dividends nor has the corporation made any payments for expenses pertaining to the land here at issue, including taxes or interest and principal amortization of mortgage liability. Peck Leasing purchased one other parcel of land in 1979 for $ 20,000 cash. Petitioners improved such land by constructing a residence thereon. Petitioners leased the land from Peck Leasing and rented the property to an unrelated party. Petitioners included in gross income all rents received from unrelated parties in actual possession of the subject properties under prior leases. Petitioners continued to pay the interest and principal amortization on the notes secured by such properties and petitioners deducted the interest paid on such indebtedness. Petitioners, likewise, paid and deducted the taxes attributable to both the land and improvements. As tenants of the land interests, petitioners paid rent to Peck Leasing in the amounts of $ 8,290, $ 24,870, $ 24,870 for 1974, 1975, and 1976, respectively. In his notices of deficiency, respondent *739 disallowed those claimed rental deductions under section 482. [3]
OPINION Petitioners owned certain improved real property. Petitioners transferred the underlying land to their controlled corporation but retained the improvements thereon. The corporation simultaneously leased back the land to petitioners. Petitioners continued to pay all taxes, mortgage payments, and gardening expenses associated with the real property, including the above expenses attributable to the land owned by the corporation. Petitioners also paid a fixed sum of $ 24,870 per year for rent to their corporation for the use of the land. The issue is the extent to which petitioners are entitled to deduct those rents paid to their controlled corporation. In his notices of deficiency, respondent disallowed those deductions under Section 482. At trial respondent further argued those rents are not deductible because the transfer and leaseback should be ignored for tax purposes. Transfer - Leaseback
Respondent contends that the transfer of land was a "sham" and that such transfer *740 and leaseback should be ignored for tax purposes. That Peck Leasing existed as a corporate entity under state law cannot be disputed. It is now well settled that a corporation will remain a separate tax entity for income tax purposes so long as the purpose of its incorporation is the equivalent of business activity or is followed by the carrying on of a business by the corporation. Moline Properties v. Commissioner, 319 U.S. 436, 439 (1943). Likewise, it is not disputed that the land was transferred and the leaseback created enforceable obligations under state law. Thus, respondent's contention that the transfer of land was a "sham" is without merit. Rather, the precise issue we are presented is whether such transfer and leaseback should be recognized for Federal tax purposes so that petitioners should be allowed the claimed rental deductions on the ground that those payments were "made as a condition to the continued use or possession * * * of property" under Section 162(a)(3).
*741 The designation of payments as "rental" does not legally characterize them as such. Nor does the fact that the obligation may have been enforceable render such payments deductible as rent. Deputy v. duPont, 308 U.S. 488 (1940). However, a taxpayer has a right to conduct his business according to his own desires and, generally, so long as the lessor retains significant and genuine attributes of the traditional lessor status, the form of the transaction governs for tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561 (1978). At the same time, we are fully aware that transactions between a corporation and its controlling shareholders should be given close scrutiny. Higgins v. Smith, 308 U.S. 473 (1940); Ingle Coal Corporation v. Commissioner, 174 F.2d 569 (7th Cir. 1949), affg. 10 T.C. 1199 (1948). No clear lines of demarcation separate those instances when a transaction will or will not be recognized for tax purposes. The question in ultimately one of fact. While no single factor is controlling, we believe the appropriate guideline in this case is whether the transfer of land to Peck Leasing *742 served a legitimate business purpose. See Carroll v. Commissioner, T.C. Memo. 1978-173. Where no legitimate business purpose is served and the transaction is simply motivated by a desire to minimize taxes, the transfer and leaseback will be disregarded. W.H. Armston Co. v. Commissioner, 188 F.2d 531, 533 (5th Cir. 1951), affg. 12 T.C. 539 (1949). Without ignoring the element of control retained by a taxpayer, this Court adopted that same business standard as an appropriate guideline to determine whether a transfer-leaseback should be recognized for tax purposes in the context of a tax free transfer to a controlled corporation under section 351. Carroll v. Commissioner, supra.[4] The transfer in this case was to a corporation also, presumably, tax free under section 351.
*743 Peck Leasing, itself, was created to provide an alternative source of income to petitioners since they had only one source of income, namely that of Donald A. Peck's practice as a surgeon. The transfer of land to Peck Leasing furthered petitioners' goal of creating such an alternative source of income. Cash flow from the land lease provided the financial basis for the business. Through receipt of those rents, Peck Leasing was able to finance the purchase of automobiles for lease. Profits were retained and used for further business expansion. Capital generated from the lease contributed significantly to the corporation's growth. Peck Leasing expanded significantly each year showing a marked and continuous increase in total assets and net income. By its taxable year ending June 30, 1980, Peck Leasing reported total assets of $ 657,004.71 and a net income of $ 50,865.67 which was derived from gross rents of $ 155,406.90. Such figures go a long way in fulfilling petitioners' hope of creating an alternative source of income. Clearly, this transfer served a legitimate business purpose. Respondent contends the entire arrangement was motivated purely by tax avoidance. Respondent *744 points out that petitioners admittedly retained the buildings to retain tax benefits associated with ownership of such buildings. We see nothing sinister about that. Respondent also points to the fact that, although the corporation included in its gross income all rents received from petitioners, the corporation's income tax liability, nevertheless, did not increase. However, the fact that the corporation paid no income taxes does not establish that tax avoidance was petitioners' sole motivation. In fact the very reason for the corporation's zero income tax liability during the years in issue belies respondent's position. Peck Leasing ultimately paid no income tax during those years because it was allowed substantial investment credits which offset any income tax liability. [5] Those investment tax credits arose from the very business activity which was made possible in part by rents generated by the land leases. [6]
*745 We simply cannot accept respondent's contention that the transfer-leaseback arrangement was motivated purely by tax avoidance. We recognize that a desire to decrease taxes may have played an important role in this transaction, but that does not require a finding that the transaction is something other than what it purports to be. Sun Properties v. United States, 220 F.2d 171, 174 (5th Cir. 1955). Section 482
Even though the transfer-leaseback must be recognized for Federal tax purposes, respondent contends that either a portion or all of the claimed rent deductions should be disallowed under section 482. [7]Section 482 authorizes respondent to distribute, apportion, or allocate gross income, deductions, and credits between two or more organizations, trades, or businesses which are owned or controlled by the same interests, when necessary to reflects clearly income. *746 Since petitioners control Peck Leasing, the two separate trades or businesses requirement of section 482 is met herein. Cooper v. Commissioner, 64 T.C. 576 (1975). Ach v. Commissioner, 42 T.C. 114 (1964), affd. 358 F.2d 342 (6th Cir. 1966). The dispute centers on whether respondent acted within his authority under section 482 in order to reflect clearly petitioners' income.
Section 482 contemplates that transactions between commonly controlled entities will be subjected to special scrutiny to ascertain whether the common control is being used to reduce taxes. The judicial and legislative history indicate section 482 is designed to remedy one abuse: the shifting of income from one commonly controlled entity to another. Your Host, Inc. v. Commissioner, 58 T.C. 10, 24 (1972), affd. 489 F.2d 957 (2d Cir. 1973); Ballentine Motor Co. v. Commissioner, 321 F.2d 796 (4th Cir. 1963), affg. 39 T.C. 348 (1962); H. Rept. 2, 70th Cong., 1st Sess., 1939-1 C.B. (Part 2) 384, 395. *747 Thus, respondent has discretion under section 482 to place controlled taxpayers on the same level with uncontrolled taxpayers dealing at arm's length. Sec. 1.482-1(b)(1), Income Tax Regs.
Respondent contends that petitioners paid rent in excess of that rent which would have been charged had the parties dealt at arm's length. Respondent determined the amount of excessive rent by taking into account certain of those payments petitioners continued to make in addition to the fixed sum denominated rent. Those additional payments were for expenses directly attributable to the land transferred to the corporation, namely taxes, mortgage payments, and gardening expenses. Respondent contends that, because of those additional payments, the rent paid ($ 24,870 per year) exceeds the rent that would have been charged had the parties dealt at arm's length. Thus, respondent proposes to disallow petitioners' claimed rent deduction by the amount of those additional payments. Petitioners maintain they were required to make such other payments in addition to the fixed rental charge of $ 24.870 per year under what they claim is a net lease, the terms of which were fair. *748 We find for respondent. As previously noted, respondent has discretion in applying section 482. His determination will be sustained unless that discretion has been abused. Grenada Industries, Inc. v. Commissioner, 17 T.C. 231 (1951), affd. 202 F.2d 873 (5th Cir. 1953). The burden falls on petitioners to prove an abuse of that discretion. Aiken Drive-In Theatre Corporation v. United States, 281 F.2d 7, 11 (4th Cir. 1960). Petitioners contend the terms of the "net" lease were fair. Petitioners computed the rental fee by multiplying the fair market value of the land, $ 283,000, by nine percent, the applicable rate of interest at that time. It is apparent such computation lacked any element of bargaining. To establish the fair rental value, petitioners, at trial, compared the rental value of one other like kind property. Petitioners noted the lease rate for such other like kind property was nearly the same figure used to compute their own rental charge, referring to the nine percent figure used above. No other details of that lease were *749 given. On brief, petitioners contend the terms of the "net" lease, which included those additional payments, were fair. It is apparent that petitioners decided, as an afterthought, that the terms of the lease including the obligation to pay those additional expenses were fair and reasonable. When petitioners first computed their rental fee, such computation failed to consider upon whom the expenses associated with the property fell. Furthermore, we find it highly unlikely an unrelated lessee in petitioners' position would have paid $ 24,870 per year for the use of the land while also carrying responsibility for taxes, mortgage payments, and gardening expenses attributable to such land. Petitioners have not come forward with any reliable evidence that those are terms that would have been arrived at had the parties dealt at arm's length. In short, petitioners have failed to show respondent abused his discretion when he determined petitioners paid "excessive" rent. To the extent of such "excessive" rent (the amount of additional payments for taxes, mortgage liability, and gardening expenses attributable to the land), income has been shifted from one commonly controlled entity to *750 another.Therefore, respondent properly exercised his discretion under section 482 in "disallowing" petitioners' rent deduction by the amount of such "excessive" rent. [8]
Respondent makes an alternative contention under section 482 that all payments *751 for real property taxes and debt service including those attributable to the improvements, constitute payments that would not have been made in an arm's-length transaction. To the extent respondent includes payments attributable to the improvements in his determination of "excessive" payments, such determination is unreasonable and constitutes an abuse of his discretion. Your Host, Inc., v. Commissioner, 58 T.C. at 23; V.H. Monette & Co. v. Commissioner, 45 T.C. 15, 36-37 (1965). Petitioners retained ownership of the improvements of all eight parcels of real property. Expenses attributable to such improvements remain distinctly petitioners' own obligation and are not payments that would not have been made by parties dealing at arm's length. In summary, we recognize the transfer-leaseback for Federal tax purposes, and that certain payments by petitioners constitute deductible rent; however, we hold respondent acted within his authority under section 482 when he determined petitioners paid rents to their controlled corporation in excess of an amount which would have been charged in an arm's-length transaction.The parties are directed to compute the *752 amount of such "excessive" rent consistent with the directions in this opinion. To reflect the foregoing and concessions, Decision will be entered under Rule 155. Footnotes
1. Petitioners subsequently transferred 400 shares of the Class B nonvoting stock to their children. At all times relevant, petitioners owned the remaining stock which represented greater than 98 percent of the total shares outstanding.↩
2. The aggregate transfers of all eight parcels of land with the corresponding leasebacks will also be referred to in the singular as the transfer and/or the leaseback.↩
3. All section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue.↩
4. As we said in Carroll v. Commissioner, T.C. Memo. 1978-173: "[i]f the element of retention of control were considered the determining factor, no transfer and leaseback between a corporation and its shareholders could be sustained. Any such tenet would raise havoc in situations that otherwise have all elements of a normal commercial transaction and fails to recognize the realities of the use of the corporate structure in the business world * * *." Thus, cases involving a transfer-leaseback to a family trust are distinguishable. In those instances, control plays a more important role. See Mathews v. Commissioner, 61 T.C. 12 (1973), revd. 520 F.2d 323 (5th Cir. 1975); Van Zandt v. Commissioner, 40 T.C. 824 (1963), affd. 341 F.2d 440↩ (5th Cir. 1965).
5. Peck Leasing did pay income taxes for its FYE in 1975 and its FYE in 1976, but recovered such taxes through the carryback of subsequent investment tax credits. ↩
6. Since all loans made to Peck Leasing were granted on petitioner's credit alone and were personally guaranteed by petitioners, respondent contends the ownership of land did not contribute to Peck Leasing's expansion. However, it is not unusual for shareholders to guarantee the notes of their closelyheld corporations. We find it obvious that rental income derived from ownership of the land contributed to the business's expansion.↩
7. Respondent purports to "disallow" the deductions under sec. 482. Section 482 does not authorize respondent to "disallow" deductions but rather sec. 482 authorize respondent to "distribute, apportion, or allocate" certain items between related taxpayers. Implicit in a "disallowance" to petitioners is a correlative adjustment to Peck Leasing, not a party to this proceeding. Sec. 1.482-1(d)(2), Income Tax Regs. See also Aiken Drive-In Theatre Corporation v. United States, 281 F.2d 7, 11↩ (4th Cir. 1960).
8. Petitioners' payment of property taxes and mortgage payments related to both land and improvements on the real estate. Only those payments attributable to the land and allocable to the lease period constitute "excessive" rent. The exact amounts are a proper subject for the parties under Rule 155, Tax Court Rules of Practice and Procedure.↩ Respondent suggests the tax assessor's ratio for allocating value between land and improvements should be adopted to allocate the portion of taxes and mortgage payments attributable to the land. Petitioners did not offer another method of allocation and did not object to respondent's suggestion. Accordingly, for purposes of computing the portion of taxes and mortgage payments attributable to the land, the parties are directed to use the tax assessor's ratio of allocating 25 percent of the total property market value to the land. Of course, all gardening expenses are attributable to the land.